1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

NEVADA RESTAURANT SERVICES, INC.,
d/b/a DOTTY'S,

          Plaintiff,

JACKPOT JOANIES FP, LLC; JACKPOT
JOANIES DF, LLC, and ECLIPSE
GAMING SHMP LLC,

          Consolidated Plaintiffs,

     v.

CLARK COUNTY, a Municipal Corporation;
BOARD OF COUNTY COMMISSIONERS
OF CLARK COUNTY; and DOES I through
X,

          Defendants.

Case No. 2:11-cv-00795-APG-PAL

Consolidated with:

Case No. 2:11-cv-00824-APG-PAL

**ORDER ON MOTIONS FOR SUMMARY
JUDGMENT**

(Dkt. Nos. 38, 39 and 42)

Pending before the Court are motions for summary judgment filed by plaintiff Nevada

Restaurant Services, Inc. ("Dotty's") [Dkt. #38] and defendant Clark County (the "County") [Dkt.

# 42], and the Joinder [Dkt. # 39] to Dotty's Motion filed by consolidated plaintiffs Jackpot

Joanies FP, LLC, Jackpot Joanies DF, LLC, and Eclipse Gaming SHMP LLC (collectively,

"Jackpot Joanies"). The parties have agreed that there are no genuine disputes of material fact;

thus, the Court can enter judgment as a matter of law. FED. R. CIV. P. 56(a).

1    Dotty's[1] challenges the County's adoption of Ordinance L-252-11 (the "Ordinance").  The

2    Ordinance amended Clark County Municipal Code Chapter 8.20 by adding new requirements for

3    "taverns" with restricted gaming licenses—most notably, a bar with eight embedded slot

4    machines (out of a total of 15 allowed machines), 2,500 square feet of open space, and a "tavern

5    restaurant" with 25 seats.  Some of the new requirements were retroactively applied, depending

6    on a tavern's date of licensure.

7    In its Motion, Dotty's does not challenge the County Board's discretionary decision to

8    adopt the Ordinance (i.e., the soundness or wisdom of the County Board's decision).  Rather,

9    Dotty's first contends that the County Board did not comply with the procedures mandated by

10   NRS §§ 237.080 and 237.090, which require local governments to prepare a business impact

11   statement ("BIS") with specified content before adopting a proposed rule.

12   Dotty's next contends that the Ordinance violates NRS § 244.187, which allows county

13   governments to "displace or limit competition" in specified industries not including gaming.

14   Dotty's argues that the exclusion of gaming from NRS § 244.187 deprives counties of the power

15   to limit competition in gaming, which Dotty's contends is the Ordinance's principal intention and

16   effect.  For the reasons set forth below, Dotty's arguments are rejected.

17

18   **I.     Business Impact Statement — NRS §§ 237.080, 237.090**

19        **A.     Standard of Review**

20        The BIS statute does not specify the judicial standard of review that applies to challenges

21   to the adequacy of a BIS.  Nor has the Nevada Supreme Court articulated the applicable standard

22   of review.  The Nevada Supreme Court's interpretation of the mandamus statute (NRS § 34.160)

23   is instructive, however.[2]  "A writ of mandamus will issue when the respondent has a clear, present

24   legal duty to act.  Mandamus will not lie to control discretionary action . . . , unless discretion is

25   _____

26   [1] Because Jackpot Joanie's joined in the arguments set forth in Dotty's Motion for Summary
     Judgment, references herein to Dotty's include Jackpot Joanie's.

27   [2] Dotty's Amended Complaint seeks mandamus, judicial review, injunctive relief, and declaratory
     relief.  [Dkt. # 10.]

28

1  manifestly abused or is exercised arbitrarily or capriciously." *Round Hill Gen. Improvement Dist.*

2  *v. Newman*, 637 P.2d 534, 536 (Nev. 1981). A distinction exists between ministerial duties,

3  which a government body has no discretion to not perform, and discretionary actions, to which

4  courts must grant considerable deference. *See id.* The procedures mandated by the BIS statute

5  are ministerial, as conceded by the County [Dkt. # 41 at 20:22–24], because government bodies

6  have no choice but to perform them before enacting a proposed rule. NRS §§ 237.080, 237.090.

7       The Court is also guided by the review standard that courts have applied to other states'

8  BIS statutes and to similar federal and state environmental impact statement statutes. Oregon has

9  a fiscal impact statement ("FIS") requirement that is analogous to Nevada's BIS requirement. *See*

10 *Oregon Cable Telecomms. Ass'n v. Dep't of Revenue*, 240 P.3d 1122 (Or. Ct. App. 2010). In

11 *Oregon Cable*, the Oregon Court of Appeals analyzed the adequacy of an FIS, first determining

12 what the statute required as a matter of law and then comparing the FIS against that standard:

13      We have focused on the policy objectives . . . to determine the adequacy of agency
        fiscal impact statements. . . . The overarching policy objective of the fiscal impact
14      statement is to provide protections against arbitrary and inadequately publicized
        government conduct. . . . [I]n instances *where the information provided is*
15      *sufficient to allow the public and affected businesses to assess their particular*
        *positions and financial situations and determine the likely impact on them*, a
16      procedural challenge to a rule based on an allegedly inadequate fiscal impact
        statement will fail. If, however, the statement falls short of that standard, the rule
17      must be declared invalid.

18 *Id.* at 1128 (internal quotation marks and citations omitted, emphasis added). In other words,

19 Oregon courts will not invalidate a rule because of procedural errors that do not meaningfully

20 impact the participatory and informational objectives of the FIS statute.

21      An Environmental Impact Statement ("EIS") is similar to a BIS in that both include

22 statutorily-mandated information for the purposes of enabling meaningful comment by affected

23 persons and entities and of fostering informed and reasoned decision-making by government

24 bodies.[3] The policies underlying the EIS notice requirements are similar to Oregon's FIS statute:

25      The adequacy of an EIS depends upon whether it was prepared in observance of
        the procedure required by law. . . . The Ninth Circuit has adopted a "rule of

26

27      ---
        [3] The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331–4370h, governs the
28 content of EISs for federal matters.

3

1   reason[]" test that requires inquiring into whether an EIS contains a reasonably
    thorough discussion of the significant aspects of the probable environmental
2   consequences, and *whether the EIS's form, content, and preparation foster both
    informed decisionmaking and informed public participation.*

3   *Havasupai Tribe v. U.S.*, 752 F. Supp. 1471, 1490 (D. Ariz. 1990), *aff'd* 943 F.2d 32 (9th

4   Cir. 1991) (emphasis added). The review of EIRs[4] by California state courts is essentially

5   the same:

6       Where a party seeks judicial review . . . on the grounds of noncompliance with
        [CEQA[5]], the inquiry shall extend only to whether there was a prejudicial abuse of
7       discretion. Abuse of discretion is established if the agency has not proceeded in a
        manner required by law or if the determination or decision is not supported by
8       substantial evidence. . . . Generally speaking, an agency's *failure to comply with
        the procedural requirements of CEQA is prejudicial when the violation thwarts the*
9       *Act's goals by precluding informed decision-making and public participation.*

10  *San Lorenzo Valley Comm'y Advocates for Responsible Educ. v. San Lorenzo Valley Unified Sch.*

11  *Dist.*, 44 Cal. Rptr. 3d 128, 140 (Cal. Ct. App. 2006) (emphasis added).

12      The Oregon FIS approach and the federal and California EIS/EIR approaches are

13  fundamentally the same. Because Dotty's challenges only the pre-decision procedural

14  requirements of Nevada's BIS statute, the Court's review is limited to whether the County

15  "proceeded in [the] manner required by law" and, if not, whether any "failure to comply with the

16  procedural requirements" of the BIS statute thwarted its goals by "precluding informed decision-

17  making [by the County] and . . . participation" by affected businesses. *Id.* Dotty's confirms that

18  the goal of "the business impact statement process is to provide a streamlined and efficient way

19  for affected businesses to have a voice in the ordinance-adoption process and for busy board

20  members to fairly evaluate the anticipated economic impact their actions may have on local

21  businesses so they can make an ***informed*** decision." [Dkt. # 38 at 10 (emphasis in original).]

22

23

24

25

26      [4] In California, the relevant document is termed an environmental impact report ("EIR"), rather
    than an environmental impact statement ("EIS").

27      [5] The California Environmental Quality Act ("CEQA"), CAL. CODE PUB. RES. §§ 21000–21189.3,
28  governs the content of that state's EIRs.

**B.     Statutory Requirements for a Business Impact Statement**

NRS § 237.080 sets forth the procedures leading up to the preparation of a BIS, while

NRS § 237.090 governs the content of a BIS.

### 1.     Proper Notice of the Proposed Rule — NRS § 237.080(1)

NRS § 237.080(1) provides:

> Before a governing body of a local government adopts a proposed rule, the
> governing body . . . must notify trade associations or owners and officers of
> businesses which are likely to be affected by the proposed rule that they may
> submit data or arguments to the governing body . . . as to whether the proposed
> rule will:

> (a)  Impose a direct and significant economic burden upon a business; or

> (b)  Directly restrict the formation, operation or expansion of a business.

On February 9, 2011, the County sent to tavern, liquor, and gaming licensees and to

related community partners a "Notification of Proposed Amendment Changes to Clark County

Code." The notice included three Proposed Ordinances. [Dkt. # 38-4 at 2.]  On February 15, the

County sent out a revised notice with a fourth Proposed Ordinance.  [Dkt. # 42-6 at 4.]  These two

notices stated that the Proposed Ordinances would be introduced on March 1, and that a public

hearing was scheduled on March 15.  On March 4, the County issued another revised notice.

[Dkt. # 38-6 at 2.]  This notice requested comments specifically under the BIS statute, extended

the response deadline from March 4 to March 28, stated that the Proposed Ordinances had been

introduced on March 1, and repeated that a public hearing was scheduled.  [*Id.*]  This notice was

posted in nine publications, including the minority press, and made available on the County's

website.  [Dkt. # 38-11 at 4.]  The County then issued a Comparison Matrix ("Matrix")

highlighting the similarities and differences among the proposed ordinances.  [Dkt. # 41-8 at 6–

10.]  On March 21, the County issued a Frequently Asked Questions ("FAQ") document to

provide even more information to stakeholders about the proposals.  [Dkt. # 38-7 at 2–5.]

The County accepted comments on the Proposed Ordinances through the close of business

on March 28, 2011.  [Dkt. # 38-11 at 4; Dkt. # 42 at 6.]  The County then prepared a BIS for each

Proposed Ordinance based on the information submitted by Dotty's and others.  The four BISs

1 were published for review by interested parties before the April 5, 2011 County Board meeting

2 (at which the Ordinance was approved), were included on the agenda for the meeting, and were

3 made part of the meeting's record. [Dkt. # 42 at 8; *see* Dkt. # 38-11 at 5–7.]

4      Dotty's argues that the notice of the four Proposed Ordinances did not sufficiently allow

5 affected businesses to assess the proposals' impacts because businesses could not know which

6 ordinance would ultimately be considered for adoption. Dotty's also argues that the County

7 Board's final adoption of a hybrid bill (combining portions of some of the proposals) rendered it

8 impossible for businesses to properly comment up front. The County responds, correctly, that

9 requiring a notification to include only the precise wording of one proposed rule (with no

10 alternatives) would significantly frustrate and delay the legislative process.

11      NRS § 237.080 does not specify what must be included in a notice of a proposed

12 ordinance, but Dotty's is correct that the notice must contain sufficient information for affected

13 businesses to fairly determine the effects of the proposed ordinances. Under the federal

14 Administrative Procedure Act ("APA") notice of a proposed rule "shall include . . . either the

15 terms or substance of the proposed rule or a description of the subjects and issues involved." 5

16 U.S.C. § 553(b)(3).

17      [The notice need not] announce the final rule that ultimately is adopted. The final
rule permissibly may differ from versions that were presented to the public in the
18      notice of proposed rulemaking. . . .The public's right to comment is protected if
the final rule is a *logical outgrowth* of the proposals on which the public had the
19      opportunity to comment.

20 *Hall v. U.S. E.P.A.*, 273 F.3d 1146, 1163 (9th Cir. 2001) (internal quotation marks and citation

21 omitted, emphasis added).

22      The rule-making procedures in the Nevada Administrative Procedure Act ("Nevada

23 APA") differ from those in NRS § 237.080(1) and (2). The state "agency that intends to adopt,

24 amend or repeal a permanent regulation must deliver to the Legislative Counsel a copy of the

25 proposed regulation." NRS § 233B.063(1). The agency then must give notice of its intended

26 action, and the notice must include "a statement explaining how to obtain the approved or revised

27 text of the proposed regulation prepared by the Legislative Counsel." NRS § 233B.0603(1)(a)(3).

28

6

1    Although these procedures differ from those in the BIS statute and the federal APA, the goal—

2    providing notice of the subject matter of the hearing—is similar.  "Inherent in any notice and

3    hearing requirement are the propositions that the notice will accurately reflect the subject matter

4    to be addressed and that the hearing will allow full consideration of it. . . . A hearing is not

5    meaningful without an awareness of the matters to be considered."  *Pub. Serv. Comm'n of Nevada*

6    *v. Sw. Gas Corp.*, 662 P.2d 624, 626 (Nev. 1983) (internal quotation marks and citations omitted).

7            The question then is whether the Ordinance is a logical outgrowth of the four Proposed

8    Ordinances described in the notices.  While some modifications were made during the County

9    Board hearing, the Ordinance is essentially an amalgamation of the four Proposed Ordinances.

10   The 2,500 square foot "open space" requirement was contained in Proposed Ordinances 1 and 3.

11   The "bar+8 embedded slots" requirement is a softening of the 10 embedded slots in Proposed

12   Ordinances 1 and 3.  The "tavern restaurant" requirement was included in Proposed Ordinances 1

13   and 3, although the prohibition on counting bar seats toward the 25-seat minimum was added

14   later.  The 2,000-feet distance requirement was a compromise of the 2,640 feet, 2,500 feet, and

15   2,000 feet limitations in, respectively, Proposed Ordinances 1, 3 and 4.  The retroactivity aspects

16   of the Ordinance appear to be a compromise among all the Proposed Ordinances, with the

17   greatest similarity to Proposed Ordinance 3.  The Ordinance does not contain any wholly new

18   requirements that could reasonably be called a surprise.  The Ordinance is certainly a logical

19   outgrowth of the four Proposed Ordinances.

20           Dotty's argues that the County's issuance of the FAQ and the Matrix was a response to

21   the public's confusion about the four proposals.  That may be true, but those documents served

22   well to clarify the Proposed Ordinances and highlight the differences among them.  Including the

23   FAQ and Matrix, the notices gave affected businesses sufficient information to determine whether

24   the Proposed Ordinances would impose a direct and significant economic burden on them or

25   directly restrict the formation, operation, or expansion of a business; this is all the statute requires.

26   NRS § 237.080(1).  The Ordinance did not vary so much from the Proposed Ordinances that the

27

28

7

1    up-front comments were inapplicable or otherwise insufficient to communicate the business

2    community's concerns to the County Board.

3           Dotty's also contends that the notice should have explicitly warned that under NRS

4    § 237.080(2), the failure to respond would result in a rebuttable presumption of no significant

5    economic effects. But the statute has no such requirement. The County need not communicate

6    every aspect of the BIS statute in the notice. Regulated businesses are responsible to make

7    themselves aware of applicable laws and regulations. *See United States v. Int'l Minerals &*

8    *Chem. Corp.*, 402 U.S. 558, 563 (1971) ("The principle that ignorance of the law is no defense

9    applies whether the law be a statute or a duly promulgated and published regulation."). Thus, the

10   County complied with NRS § 237.080(1).

11                    **2.        Determination of Economic Burdens — NRS § 237.080(3) and (5)**

12          After the notice period has expired, "the governing body . . . shall determine whether the

13   proposed rule is likely to: (a) impose a direct and significant economic burden upon a business; or

14   (b) directly restrict the formation, operation or expansion of a business. . . ." NRS § 237.080(3).

15   "After making a determination pursuant to subsection 3, the governing body . . . shall prepare a

16   business impact statement." NRS § 237.080(5). Dotty's argues there is no evidence that the

17   County made the required determination. However, the County's preparation of the four BISs,

18   and their content, indicate otherwise.

19           The BISs are strong evidence that the County made a determination pursuant to NRS

20   § 237.080(3). Without such a determination, it would be quite difficult, and unnecessary, to

21   prepare a meaningful BIS. Moreover, the BISs' discussions of the Proposed Ordinances'

22   economic effects—including the difficulties that some taverns will have operating under stricter

23   regulations—support the conclusion that "a determination" was made for each Proposed

24   Ordinance. Accordingly, the County complied with NRS § 237.080(3) and (5).

25

26

27

28

**3.      Consideration of Methods to Reduce Impacts — NRS § 237.080(4)**

The BIS statute also required the County to consider methods to reduce the potential

economic burdens of the Proposed Ordinances.

> If the governing body . . . determines . . . that a proposed rule is likely to impose a
> direct and significant economic burden upon a business or directly restrict the
> formation, operation or expansion of a business, the governing body . . . shall
> consider methods to reduce the impact of the proposed rule on businesses,
> including, without limitation:
>
>      (a) Simplifying the proposed rule;
>
>      (b) Establishing different standards of compliance for a business; and
>
>      (c) Modifying a fee or fine set forth in the rule so that a business is
>      authorized to pay a lower fee or fine.

NRS § 237.080(4).  The County argues that its consideration of four different Proposed

Ordinances, each with varying business impacts, and its adoption of the final Ordinance that

"modified slightly and blended parts of the four proposals make[] clear that the [County Board] at

the hearing on April 5, 2011 considered methods to reduce impacts and still meet the public

health and safety goals embodied in the ordinance."  [Dkt. # 41 at 17–18.]  The County further

contends that it "considered the impact and made efforts to ameliorate the impact while advancing

the public interest . . . to avoid so-called slot parlors or arcades."  [*Id.* at 18.]

Dotty's argues that the County's realization that the proposals might curtail the additions

of new taverns in Clark County "triggered the County's duty . . . to consider methods to reduce

this impact."  [Dkt. # 49 at 5.]  Dotty's contends the County did nothing to reduce this impact,

and that the "version that was ultimately adopted incorporated all of the most impactful portions

of each proposed rule."  [*Id.*]

Dotty's is correct that NRS § 237.080(4) imposes upon the County the duty to consider

methods to reduce the Proposed Ordinances' potential impacts.  Once the County considers such

methods, however, its duty is discharged.  The statute does not require the County to adopt any

such methods.  The statute requires the County only to "consider" such methods.

9

1         The four different Proposed Ordinances—and the County Board's discussion of them at

2    the April 5, 2011 hearing—demonstrate that the County considered a variety of methods to

3    reduce the potential negative business impacts.  The Proposed Ordinances had different distance

4    separation requirements, different retroactivity provisions, different requirements for embedded

5    slots, and different "open space" requirements.[6]  Ultimately, the County Board adopted a hybrid

6    Ordinance, combining aspects of the Proposed Ordinances.  The County complied with NRS

7    § 237.080(4).

8                 **4.**       **Summary of Public Response — NRS § 237.090(1)(a)**

9         NRS § 237.090(1) specifies what information must be included in a BIS.  First, a BIS

10   must include "[a] description of the manner in which comment was solicited from affected

11   businesses [and] a summary of their response . . . ."  NRS § 237.090(1)(a).  Dotty's contends that

12   the BISs did not contain "fair" summaries.  [Dkt. # 38 at 11–12.]  Specifically, Dotty's asserts

13   that the BISs (i) did not reflect the strong concern, as expressed in the affected businesses'

14   comments, that the proposed rules were protectionist measures for the casino industry; (ii) did not

15   reflect that various tavern owners wanted the rules to be prospective because retroactive rules

16   would force some to close their taverns; and (iii) did not tally the comments to indicate that those

17   against the proposed rules outnumbered those in favor by 13 to 1.  [*Id.*]  Dotty's contends that the

18   County Board could not fairly weigh the true business impacts of the proposed rules because the

19   BISs' summaries did not reflect the number and breadth of negative comments or the objectors'

20   concerns.  [*Id.*]

21

22        [6] Dotty's assertion that the County Board adopted all of the Proposed Ordinances' most impactful

23   provisions is incorrect.  Some of the proposals required ten embedded slots; the Ordinance requires eight.
    Two of the proposals required 2,640 feet and 2,500 feet of separation between taverns; the Ordinance

24   requires 2,000 feet.  Proposed Ordinance 4 included "full retroactivity for previously licensed taverns"
    [Dkt # 41-8 at 9]; the Ordinance exempts certain taverns licensed before December 1990 from the "bar+8

25   embedded slots" requirement and certain taverns licensed before December 2010 from the 2,500 square
    foot "open space" and the "tavern restaurant" requirements.  Even if the County had adopted the most

26   stringent requirements in the Proposed Ordinances, however, that would not constitute a violation of NRS
    237.080(4) because the County considered methods to reduce impacts to business.  The consideration is

27   what counts under NRS 237.080(4), not the result.

28

1    The statute mandates no particular level of specificity for the "summary" of responses.

2    [Dkt. # 49 at 7.]  Reference to dictionaries for definitions of common terms is permissible.  *U.S.*

3    *v. Santos*, 553 U.S. 507, 511 (2008) (relying on Webster's New International Dictionary).  In

4    relevant part, Merriam-Webster defines "summary" as "covering the main points succinctly."[7]

5    "Succinct," in turn, is defined as "marked by compact precise expression without wasted words."[8]

6    Thus, the summary need only cover the comments' main points in an efficient and precise

7    manner; it need not catalog every objection or tally the votes for or against a proposal.

8    While the BISs contain no section entitled "summary of responses," they adequately

9    summarize the responses received during the notice period.  [*See* Dkt. # 38-10 at 2–4.]  As the

10   Proposed Ordinances were not identical, the BISs varied in how the comments were summarized,

11   but the gist of each BIS is the same.  The general opposition to "additional regulation of tavern

12   and gaming operations" is noted, "as current tavern owners are hard pressed to keep businesses

13   open under the current regulations."  [*Id.* at 3.]  Tavern owners' particular concerns of costly

14   remodeling and new gaming devices are included, as is their concern over the potential loss in

15   business value.  [*Id.*]  The limitation on competition that would result from new regulations is

16   noted.  [*Id.*]  Although framed as a "beneficial effect" for surviving tavern owners, the concern by

17   at-risk tavern owners over forced closures is included in the BISs.

18   The BISs also noted concerns about negative impacts on business growth flowing from

19   the 2,500-square foot "open space" and 2,000-foot "door-to-door" distance requirements.  [*Id.* at

20   7.]  The BISs noted that the County received comments favoring limiting the number of "slot

21   parlors" in the County.  [*Id.*]  Possible conflicts with the Americans with Disabilities Act were

22   noted as well.  [*Id.*]  Some commentators expressed concern about surviving the current recession

23   with new regulations.  [*Id.* at 11.]  Others objected to the requirement of a 25-seat restaurant as an

24   impediment to growth.  [*Id.* at 15.]

25

26   [7] Merriam-Webster definition of "summary," http://www.merriam-webster.com/dictionary/summary.

27   [8] Merriam-Webster definition of "succinct," http://www.merriam-webster.com/dictionary/succinct.

28

1   The BISs adequately summarized the comments received. Even if the BISs did not meet
2   the precise requirements of the statute (although the court expressly finds they did), affected
3   businesses were not deprived of the opportunity to meaningfully participate in the legislative
4   process, and the County Board was not precluded from making reasoned, informed decisions.
5   The BISs fulfilled their purpose of providing sufficient information about the comments received.
6   Moreover, the entirety of the comments was attached to the BISs, further improving affected
7   businesses' and the County Board's ability to review and understand the comments. Accordingly,
8   the County complied with the "summary" requirement of NRS § 237.090(1)(a).

9
### 5.   Estimated Economic Effect — NRS § 237.090(1)(b)

10   A BIS must include "[t]he estimated economic effect of the proposed rule on the business
11   which it is to regulate, including, without limitation: (1) [b]oth adverse and beneficial effects; and
12   (2) [b]oth direct and indirect effects." NRS § 237.090(1)(b). In relevant part, Merriam-Webster
13   defines "estimate" as "a rough or approximate calculation."[9] A BIS must include then an
14   approximation (even if nonspecific) of the adverse, beneficial, direct, and indirect economic
15   effects of the proposed rules on regulated businesses. *See Oregon Cable*, 240 P.3d at 1127. The
16   statute is silent as to what constitutes a proper estimate, but only a "significant underestimat[ion]"
17   is actionable upon a petition for review to a county board of commissioners. NRS
18   § 237.100(1)(b).

19   Dotty's contends that the BISs are "devoid of any real discussion of the [proposals']
20   economic effect on the tavern industry." [Dkt. # 38 at 13.] Dotty's argues that the BISs fail to
21   consider or insufficiently consider (i) the number of taverns that will be forced to retrofit; (ii) the
22   costs associated with remodeling to comply with the new requirements; (iii) the possible conflicts
23   with the Americans with Disabilities Act and the Nevada Clean Indoor Air Act ("Nevada
24   CIAA"); and (iv) the loss of customers who dislike in-bar slot machines. [*Id.*] Dotty's next
25   asserts that the purported beneficial effects stated in the BISs—financial benefits to complying

26

27   _____
[9] Merriam-Webster definition of "estimate," http://www.merriam-
28   webster.com/dictionary/estimate.

1   tavern owners and unrestricted gaming licensees resulting from less competition—are not "truly

2   economically beneficial to the tavern industry" and thus cannot be considered beneficial. [*Id.*]

3       Dotty's further argues that the BISs do not include various indirect economic effects. The

4   new requirements, Dotty's alleges, will make it more expensive to open a new tavern because

5   fewer locations are available that can accommodate the 2,500-square foot interior "open space"

6   requirement and the 2,000-foot separation between taverns. This, in turn, will negatively affect

7   the local commercial real estate industry; several landlords so testified at the April 5, 2011

8   hearing. [*See* Dkt. # 38-11 at 42–46.] Finally, Dotty's argues that the BISs ignore the indirect

9   economic effects on the County of lost tax revenue, lost jobs, broken contracts with vendors and

10   suppliers, vacant commercial properties that will lead to blight, and increased law enforcement

11   costs. [Dkt. # 38 at 13–15.] As a result of the allegedly insufficient disclosure of economic

12   effects, Dotty's contends the County Board was unable to make an informed decision. [Dkt. # 49

13   at 7.]

14       At root, this is a question about specificity. Dotty's calls for a more detailed analysis,

15   while the County contends that the statute requires only an estimate of such effects, not a detailed

16   breakdown. The court addresses each of Dotty's concerns while keeping in mind the ultimate

17   goals of the BIS statute: to enable meaningful participation by affected businesses and informed

18   governmental decision-making. *See San Lorenzo Valley*, 44 Cal. Rptr. 3d at 140; *Havasupai*

19   *Tribe*, 752 F. Supp. at 1490; *Oregon Cable*, 240 P.3d at 1128.

20       Dotty's contention that the BIS should have provided the exact number of currently

21   licensed taverns that will need retrofitting is unavailing because the County could not know

22   precisely which taverns fell into that category. Dotty's did not provide that information, and it

23   would not be reasonable to expect the County to individually survey each tavern. The BISs

24   disclosed the number of licensees that could be affected. Moreover, the BISs disclosed that:

25   (i) some taverns would need "costly remodeling;" (ii) the in-bar slot and "tavern restaurant"

26   requirements would directly affect taverns' ability to respond to current and changing market

27   needs; and (iii) new in-bar slot machines could cost approximately \$15,000. This approximation,

28

13

1   even if sparse in dollar amounts, was sufficient to foster participation by affected businesses and

2   informed decision-making by the County Board.

3        Likewise, Dotty's contention that the BISs did not sufficiently disclose the economic

4   effects of the potential conflicts with the ADA and Nevada CIAA is unconvincing. The BISs

5   disclose, as an indirect economic effect, that the in-bar slot machines may violate the ADA.

6   While the BISs do not mention the Nevada CIAA, the comments submitted by Dotty's (which

7   were attached to the BISs) indicate that the addition of a restaurant may force taverns to become

8   non-smoking establishments under the Nevada CIAA. [Doc. 38-8 at 5.] Dotty's demands

9   revenue-loss analysis, but the County was not in a position to determine how much revenue each

10   tavern would lose upon conversion to a non-smoking facility.[10] Nor did Dotty's substantiate its

11   assertion that the restaurant requirement would compel taverns to become non-smoking. The

12   approximation of economic effects may omit indirect effects that are speculative and incapable of

13   even rough quantification. *See Northcoast Envtl. Cntr. v. Glickman*, 136 F.3d 660, 668 (9th Cir.

14   1998). In any event, Dotty's comments about the Nevada CIAA were attached to the BISs, so the

15   County Board and the public were on notice of this potential issue.

16        Similarly, the BISs were not required to include the indirect effect of the loss of clientele

17   that could result from in-bar slot machines. It would be extraordinarily difficult, if not

18   impossible, for the County to approximate what this loss could be. The BISs' discussion that

19   tavern owners "prefer to select machines based on the needs of their customers" instead of facing

20   an in-bar slot requirement is sufficient to advise that some customers may not like the in-bar

21   machines. [*E.g.*, Dkt. # 38-10 at 3.] Any more detail would have been speculative.

22        The BISs also sufficiently address Dotty's contentions that the new requirements will

23   increase the cost of opening a new tavern and will have indirect effects on commercial real estate

24   and on the County itself. The BISs acknowledge, as an indirect effect, that commercial real estate

25   may suffer and that vacancies add to crime and to an overall reduction in the marketability of

---

27      [10] Detailed information about the physical condition of specific taverns, the related retrofit costs,
and the potential loss of customers are not available to the County absent an exhaustive and expensive
tavern-by-tavern survey or the tavern owners providing the information themselves.

1   commercial property. [Dkt. # 38-10 at 15.] This is sufficient. Indeed, several landowners so

2   testified at the County Board hearing, confirming that the Board was informed about this issue

3   before adopting the final Ordinance. [Dkt. # 38-11 at 38, 62.] More importantly, the statute only

4   requires the estimated economic effect on the "business which [the proposed rule] is to regulate."

5   NRS § 237.090(1)(b) (2011). Because the Proposed Ordinances did not regulate commercial real

6   estate businesses (such as brokers or landlords), the BISs were not required to estimate such

7   economic effects.

8       Dotty's final contention—that the listed beneficial effects were not actually beneficial to

9   the tavern industry—also fails. NRS § 237.090(1)(b) does not require that the County estimate

10  economic effects for an industry as a whole. Rather, it requires estimated effects for regulated

11  businesses. Under "beneficial effects," the BISs stated that some (but not all) tavern owners

12  would benefit financially if they comply with the new rules. [*E.g.*, Dkt. # 38-10 at 4.] The BISs

13  also stated that some tavern owners would be hard pressed to stay open under the new

14  regulations. [*Id.*] Whether the harm to some tavern owners outweighs the benefit to other tavern

15  owners is a policy issue for the County Board, not this Court. The BISs sufficiently estimated the

16  economic effects by identifying adverse and beneficial effects to different groups of tavern

17  owners.

18      Finally, and perhaps most importantly, the estimated economic effects set forth in the

19  BISs provided sufficient information for meaningful participation by affected businesses and

20  informed governmental decision-making. The BISs addressed each adverse economic effect that

21  Dotty's identified in its briefing (with the exception of the Nevada CIAA) at a sufficient level of

22  specificity. And, as discussed above, Dotty's did not provide enough information to the County

23  to enable a meaningful economic analysis of the Proposed Ordinance's potential indirect effect of

24  forcing taverns to become non-smoking establishments under the Nevada CIAA and the attendant

25  economic consequences. It would be cost-prohibitive (if not impossible) to require the County to

26  determine exactly how many taverns would face retrofit or related expenses and how much those

27  changes might cost. Moreover, the entirety of Dotty's comments was incorporated into the BISs,

28

1   so interested parties and the County Board were aware of the Nevada CIAA-related concerns
2   before the April 5, 2011 meeting.

3       To the extent the BISs underestimated any particular economic effects, those
4   underestimations were not significant. *See* NRS § 237.100(2)(b). Although the identified
5   economic effects are not the same in each BIS (nor should they be because each Proposed
6   Ordinance was different), the BISs read together paint a comprehensive picture of the estimated
7   economic effects of the Proposed Ordinances. Accordingly, the County complied with NRS
8   § 237.090(1)(b).

9               **6.      Impact Reduction — NRS § 237.090(1)(c)**

10      BISs must include "[a] description of the methods that the governing body of the local
11  government . . . considered to reduce the impact of the proposed rule on businesses and a
12  statement regarding whether the governing body . . . actually used any of those methods." NRS
13  § 237.090(1)(c). Dotty's argues that the BISs are "silent as to what methods were considered,"
14  and that the County's assertion it complied by circulating four versions of the proposed rule does
15  not explain whether or to what extent the County actually considered the various proposals. [Dkt.
16  # 38 at 16.] The County responds that its consideration of four proposed rules was sufficient to
17  comply with NRS § 237.090(1)(b).

18      Each BIS contains this statement:

19      The following constitutes a description of the methods that the local government
        considered to reduce the impact of the proposed rule on business and statement
20      whether any, and if so which, methods were used: . . . *Three additional proposed*
        *ordinances, which vary in compliance regulations and grandfathering provisions,*
21      *have been made available for public comment concurrently with this proposed*
        *ordinance.*
22

23  [Dkt. # 38-10 at 3, 7, 11, 15 (emphasis in original).] This statement sufficiently describes
24  the methods considered to reduce impacts. The County considered four alternate rules,
25  each with varying restrictions (e.g., distance restrictions, number of bar-top machines,
26  retroactivity) to address possible impacts. The language of NRS § 237.090(1)(c)—
27  requiring a statement as to "whether the governing body . . . actually used any of those
28

16

1    methods"—is not directly tailored to this situation, where more than one proposal is

2    circulated and considered by the County Board.  Nevertheless, the BISs satisfied the goal

3    of the statute by informing affected business owners of the various proposals so they

4    could determine the likely impact of each proposal, assess their particular positions, and

5    participate in the process.  *See Oregon Cable*, 240 P.3d at 1128.  Ultimately, it was up to

6    the County Board to decide which method (or combination of methods) would be used by

7    voting after consideration of public comments.  The BISs satisfied NRS § 237.090(1)(c).

8                    **7.      Estimated Cost of Enforcement — NRS § 237.090(1)(d)**

9           BISs must include "[t]he estimated cost to the local government for enforcement of the

10   proposed rule."  NRS § 237.090(1)(d).  Dotty's argues that the BIS is inadequate because it does

11   not account for law enforcement costs resulting from anticipated blight.  The statute requires only

12   an estimate of the costs to enforce the proposed rule, not the potential secondary costs to the local

13   government that may indirectly flow from the proposed rule.  The BISs satisfied NRS

14   § 237.090(1)(d) by estimating there would be no additional enforcement costs beyond what the

15   County already spent to enforce the then-existing scheme.

16                   **8.      Explanation of Reasons for More Stringent Provisions — NRS**

17                   **§ 237.090(1)(f)**

18          "If the proposed rule includes provisions which duplicate or are more stringent than

19   federal, state or local standards regulating the same activity, [the BIS must include] an

20   explanation of why such duplicative or more stringent provisions are necessary."  NRS

21   § 237.090(1)(f).  Addressing this requirement, the BISs state only that "[t]he proposed rule

22   includes provisions, which duplicate or are more stringent than federal, state or local standards

23   regulating the same activity.  The following explains *which* such duplicative or more stringent

24   provisions are necessary. . . . The proposed rule is more stringent than Nevada Gaming

25   Regulation 3.015."  [Dkt. # 38-10 at 4 (emphasis added).]  Dotty's contends that this failure to

26   explain "why" (as opposed to "which") more stringent provisions are necessary is fatal.  [Dkt. #

27   38 at 16.]  The County responds that the explanation for the need for more stringent regulation is

28

                                                    17

1  found in the "beneficial impact" section of each BIS—specifically, that "all other gaming

2  licensees will benefit from reductions in competition" and that "[c]omments included those in

3  favor of limiting the amount of 'slot parlors' in Clark County." [Dkt. # 41 at 19.]

4      Part of the error may be the County's apparent misinterpretation of NRS § 237.090(1)(f).

5  The "which" in the BISs should be "why" under NRS § 237.090(1)(f). Regardless, the BISs

6  technically violated NRS § 237.090(1)(f) by failing to explain why the more stringent provisions

7  are necessary. However, this technical violation is not fatal because the affected parties clearly

8  understood the County's reasons for considering the more stringent Proposed Ordinances.

9      Testimony at the County Board hearing confirms that the reasons behind the proposed

10  ordinances were well known ahead of time. Attorney Todd Bice (representing a supporter of the

11  Proposed Ordinances) explained "the legal and factual predicate for why action is needed." [Dkt.

12  # 38-11 at 12–15.] Concern stemmed from the belief that various tavern licensees had exploited

13  the then-current state and county rules to call themselves taverns, but that gaming was the

14  primary source of revenue. [*Id.*] The Proposed Ordinance were designed to ensure that taverns

15  operate as taverns (e.g., with kitchens, restaurants, and bars), in which gaming is incidental, not

16  primary.

17      Attorney Christopher Kaempfer (representing Dotty's at the County Board hearing)

18  confirmed that Dotty's was aware of the reasons for the Proposed Ordinances. He testified that

19  "we were initially told that the purpose in bringing this Dotty's issue to the forefront was to stop

20  the proliferation . . . of Dotty's. Your new ordinances do that." [Dkt. # 38-11 at 25.] On several

21  instances, the County staff and some of the County Commissioners express concern over the

22  "proliferation" of such establishments. [*E.g.*, Dkt. # 38-12 at 36.] Attorney Mark Ferrario (also

23  representing Dotty's) testified that he researched the history of the Proposed Ordinances to

24  determine how the process evolved up to the time of the County Board hearing. [Dkt. # 38-11 at

25  29.] Ferrario noted that in December 2011, then-County Manager Virginia Valentine posted a

26  notice expressing concern that numerous establishments operating as taverns were conducting

27  business where gaming was the primary, rather than incidental, source of income. [*Id.*] Ferrario

28

18

1    also commented on the BISs' failure to comply with NRS § 237.090(1)(f): "What's missing from

2    the impact statement is why do you need it, why is it necessary. So we have some *procedural*

3    *flaws* with the process." [*Id.* at 37–38 (emphasis added).] However, none of Dotty's

4    representatives (and none of the representatives of other affected business owners) complained

5    that they did not understand why the more stringent requirements were necessary.

6          Thus, the County's violation of NRS § 237.090(1)(f) was not prejudicial to the goals of

7    the BIS statute: "to provide a streamlined and efficient way for affected businesses to have a

8    voice in the ordinance-adoption process and for busy board members to fairly evaluate the

9    anticipated economic impact their actions may have on local businesses so they can make an

10   informed decision." [Dkt. # 38 at 10 (emphasis deleted); *Havasupai Tribe v. U.S.*, 752 F. Supp.

11   1471 at 1490; *San Lorenzo Valley Comm'y Advocates*, 44 Cal. Rptr. 3d at 140; *Oregon Cable*,

12   240 P.3d at 1128.] The evidence clearly indicates that the affected businesses and public were

13   well aware of the reasons underlying the more stringent proposed regulations. Thus, under the

14   facts of this case, the violation of NRS § 237.090(1)(f) does not render the Ordinance invalid.

15

16   **II.    Limiting Competition — NRS § 244.187**

17        Finally, Dotty's contends that the Ordinance runs afoul of NRS § 244.187 because that statute

18   precludes the County from limiting competition in the gaming industry. That statute provides:

19       A board of county commissioners may, to provide adequate, economical and
         efficient services to the inhabitants of the county and to promote the general
20       welfare of those inhabitants, displace or limit competition in any of the following
         areas:
21
             [1.] Ambulance service.
22           [2.] Taxicabs and other public transportation . . . .
             [3.] Collection and disposal of garbage and other waste.
23           [4.] Operations at an airport . . . .
             [5.] Water and sewage treatment . . . .
24           [6.] Concession on, over, or under property owned or leased by the county.
             [7.] Operation of landfills.
25           [8.] . . . construction and maintenance of benches and shelters for
             passengers of public mass transportation.
26
     NRS § 244.187.
27

28

                                              19

1    Dotty's contends that because gaming is not listed in this statute, the County cannot

2  displace or limit gaming competition. [Dkt. # 38 at 18.] Dotty's further contends that one

3  intended effect of the Ordinance is to limit competition in gaming. This is a reasonable

4  conclusion in light of the BISs' listing of limited competition as a "beneficial effect" of the

5  Proposed Ordinances and the County's admission that one of the several rationales for the

6  Proposed Ordinances was to limit competition (albeit not for competition's sake alone). [Dkt.

7  # 42 at 22–23; Dkt. # 57 at 9–10.]

8    The County responds that Dotty's misinterprets NRS § 244.187, and that the County has

9  "almost limitless" power to regulate liquor and gaming, as this Court has previously held. [Dkt.

10  # 41 at 21–23.] The County argues that the statute cannot be read to limit its police powers in

11  areas outside of the enumerated list, and that the Ordinance's true purpose is to ensure that

12  gaming in taverns is merely incidental to the tavern business.

13    **A. Legal Standard**

14    "If the ordinance was (1) within the scope of authority granted the county by the state

15  government, (2) aimed at serving some legitimate public purpose[,] and (3) rationally related to

16  that purpose, this court will not second-guess the county government." *Individuals for*

17  *Responsible Gov't v. Washoe Cnty.*, 110 F.3d 699, 704 (9th Cir. 1997) (internal quotation marks

18  and citation omitted). Dotty's challenge lies in the first part of this test: whether NRS § 244.187

19  excludes from counties' scope of authority the ability to limit competition in gaming.

20    Local governments in Nevada, including counties, have broad power to regulate gaming.

21  "The power to license, regulate, and prohibit gaming is within the discretion of the municipal

22  agency empowered to govern gambling and such agency has a wide margin of discretion." *Clark*

23  *Cnty. Liquor & Gaming Licensing Bd. v. Simon & Tucker, Inc.*, 787 P.2d 782, 783 (Nev. 1990).

24  In that case, the Nevada Supreme Court (examining whether Clark County had exceeded its

25  power by denying a gaming license) confirmed that counties have the same wide discretion to

26  regulate gaming as a "municipal agency." *See id.*

27

28

20

1    The power to license, regulate, and prohibit gaming is inherently anti-competitive, but that

2    does not necessarily render illegal the exercise of that power.

3        Although the requirement of any license or the enforcement of any regulation on
         business is, to some extent, necessarily in restraint of trade, not all such restraint is
4        unlawful. In general, the state may restrain trade through licensing regulations
         under the police power, if the restraint is reasonable and is a necessary result of the
5        enforcement of valid regulatory measures.

6    51 AM. JUR. 2d *Licenses and Permits* § 19 (1970). In the absence of any other law then,

7    counties may legally regulate gaming even if such regulation has an anti-competitive effect so

8    long as the rational basis test is satisfied. *See Washoe Cnty.*, 110 F.3d at 704.

9        Dotty's argues that the list of businesses in NRS § 244.187 does not include gaming;

10   therefore, the County cannot limit gaming competition. Dotty's argument rests on the

11   presumption that the inclusion of one thing implies the exclusion of all others—the canon of

12   statutory interpretation known as *expressio unius est exclusio alterius*. *State v. Javier C.*, 289

13   P.3d 1194, 1197 (Nev. 2012). *Expressio unius* is not absolute, however. It is only "a

14   presumption that when a statute designates certain persons, things or manners of operation, all

15   omissions should be understood as exclusions." *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d

16   881, 885 (9th Cir. 2005). It is a "rule of interpretation, not a rule of law. The maxim is a product

17   of logic and common sense, properly applied only when it makes sense as a matter of legislative

18   purpose." *U.S. v. Bert*, 292 F.3d 648, 652 n.12 (9th Cir. 2002) (internal quotation marks and

19   citation omitted). The Supreme Court has used more forceful language:

20       We do not read the enumeration of one case to exclude another unless it is fair to
         suppose that Congress considered the unnamed possibility and meant to say no to
21       it. . . . As we have held repeatedly, the canon *expressio unius est exclusio alterius*
         does not apply to every statutory listing or grouping; it has force only when the
22       items expressed are members of an associated group or series, justifying the
         inference that items not mentioned were excluded by deliberate choice, not
23       inadvertence. . . .

24
     *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168–69 (2003) (internal quotation marks and
25
     citations omitted). For Dotty's to prevail then, there must be some indication that the Legislature
26
     considered including gaming in NRS § 244.187 and chose to omit it. *See Stockmeier v.*
27

28

1   *Psychological Review Bd.*, 135 P.3d 807, 811 (Nev. 2006) (the ultimate purpose of statutory

2   construction is to discern legislative intent).

3   **B.   Application**

4   The statute's legislative history and counties' broad power to regulate gaming in Nevada

5   indicate that the Legislature's exclusion of gaming from NRS § 244.187 was not intentional.

6   NRS § 244.187 was originally enacted in 1960. Its initial scope was very limited as it authorized

7   counties to grant exclusive franchises only for garbage services. 1960 Nev. Stat. 433. In 1983,

8   the Assembly Committee on Legislative Functions commissioned a study on the effect of federal

9   antitrust laws on the licensing of businesses by local government. Assembly Comm. Res. 18, 62d

10   Leg. Sess. (Apr. 19, 1983). The study was ordered in response to a decision by the U.S. Supreme

11   Court that local government entities were not immune from federal antitrust suits solely on the

12   basis of being a political subdivision of the state. *Cmty. Commc'ns Co., Inc. v. City of Boulder*,

13   455 U.S. 40 (1982). The Supreme Court held that local governments enjoyed the state's

14   sovereign immunity only if the state authorized the anti-competitive practice at issue. *Id.* at 49–

15   50.

16   The 1983 Nevada study interpreted *City of Boulder* to mean that a state may grant

17   immunity to local governments only if the state adopts a statute which clearly articulates and

18   affirmatively expresses its intent to displace competition with regulation, and the state is involved

19   in supervising the anticompetitive program. LEGISLATIVE COMM'N OF THE LEGISLATIVE

20   COUNSEL BUREAU, EFFECT OF FEDERAL ANTITRUST LAWS ON THE LICENSING OF BUSINESSES BY

21   LOCAL GOVERNMENTS, Bulletin No. 85-19 at 3 (Oct. 1984). Prior to publishing the final report,

22   questionnaires were sent to all city managers in Nevada to determine which activities of local

23   government may be subject to scrutiny by the courts for violating federal antitrust laws. *See id.* at

24   8. "The areas of *public services* in which the local governments were authorized to displace

25   competition . . . were then chosen from the responses to the questionnaire." *Id.* at 9 (emphasis

26   added). The focus was on public services rather than on the entire business community.

27

28

22

1    In January 1985, Assembly Bill 10 was introduced: "[a]n Act relating to local
2    governments; authorizing those governments to replace economic competition in certain areas of
3    *public services* with regulated anticompetitive services; and providing other matters properly
4    relating thereto." Journal of the Assembly at 30 (Jan. 24, 1985) (emphasis added).  In June 1985,
5    the bill was enacted into law.  Among other things, it added the current list of public services for
6    which a county may displace or limit competition.  1985 Nev. Stat. 1240–41.

7    There is no evidence that the Legislature considered including gaming in NRS § 244.187
8    and then chose to omit it.  The questionnaires sent as part of the Assembly Committee's study did
9    not include gaming, and the responses to the questionnaires did not add gaming as an area of
10   antitrust concern.  The business areas listed in NRS § 244.187 are members of "an associated
11   group or series," that is, public services.  *Barnhart*, 537 U.S. at 168.  Because gaming is not a
12   public service and apparently was not contemplated by the Legislature in relation to NRS
13   § 244.187, the inference that it was not included "by deliberate choice" is not justified.  *Id.*

14   The legislative intent of NRS § 244.187  was to immunize counties against federal
15   antitrust lawsuits in certain areas of public service—an expansion of power or a protection of
16   power that already existed—rather than to limit counties' power in areas not listed in the statute.
17   Therefore, the legal maxim *expressio unius* is inapplicable here.  NRS § 244.187 does not
18   prohibit counties from displacing or limiting competition in gaming.

19   Moreover, the contrary holding would lead to an absurd and unreasonable result.  If NRS
20   § 244.187 operated as Dotty's contends, counties would have no power to displace or limit
21   competition in any area not listed in this statute.  That simply cannot be.  Because regulation is
22   inherently anti-competitive (in varying degrees), Dotty's reading of the statute would gut
23   counties' regulatory power in spite of the various organic acts that grant such power to them. *See,*
24   *e.g.*, NRS §§ 244.335 (county business licensing in unincorporated areas), 244.345 (county
25   gaming licensing in unincorporated areas), 244.350 (county liquor regulation), 463.180 (county

26
27
28

23

gaming licenses), 463.230 (same).[11]  Statutes should not be read in a manner that produces an absurd or unreasonable result.  *V & S Ry., LLC v. White Pine Cnty.*, 211 P.3d 879, 882 (Nev. 2009).

Because the County's scope of authority includes limiting gaming competition, the final issue is whether the Ordinance is rationally related to a legitimate government purpose.  *Washoe Cnty.*, 110 F.3d at 704.  "The 'rational basis' test generally presumes that the law is constitutional, and thus, the courts show deference to the legislation."  *Tarango v. State Indus. Ins. Sys.*, 25 P.3d 175, 182 (Nev. 2001) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

Dotty's argues that limiting competition was the County's sole motivation for the Ordinance.  While limiting competition was one of the County's goals—the County admitted that more stringent regulations were necessary, in part, to limit competition—the County cites additional reasons for the Ordinance: limiting "slot parlors," ensuring that businesses whose primary focus is gaming do not face direct competitors that pay less taxes, and preserving jobs in Clark County.  [Dkt. # 41 at 22–23.]  Preserving jobs and preventing restricted licensees from unfairly competing with unrestricted licensees are both legitimate government purposes.  The County has wide discretion to determine which means to employ in order to meet these objectives.  The Ordinance's new requirements are rationally related to the County's purposes in

---

[11] While the Nevada Supreme Court has not spoken on whether counties may displace or limit competition in areas not listed in NRS § 244.187, the Nevada Attorney General has issued one opinion on point.  1993 Nev. Op. Atty. Gen. 14 (1993).  The Attorney General opined that a Clark County ordinance requiring all locksmiths to have a physical location of a certain size (rather than operate exclusively as mobile businesses) did not violate NRS § 244.187.  *Id.*  The Attorney General first noted that the state has delegated the power to regulate locksmiths to counties, and then reasoned that because the ordinance was enacted in order to promote the public welfare, it was entitled to a presumption of validity.  *Id.* (citing *Koscot Interplanetary, Inc. v. Draney*, 530 P.2d 108 (Nev. 1974)).  The Attorney General determined that the ordinance was a reasonable means of controlling trade, in part because it did not amount to the grant of an exclusive franchise.  *Id.*  The Attorney General concluded that the Ordinance's requirements constituted a rational means to protect the public.  *Id.*  The present matter is analogous.  The Ordinance does not grant an exclusive franchise.  Moreover, locksmithing, like gaming, is not listed in NRS § 244.187.  The Attorney General did not interpret NRS § 244.187 to diminish counties' power to regulate unlisted areas in a manner that restrains trade.  Although not binding on this Court, the opinion of Nevada's highest legal officer has persuasive value.

enacting the Ordinance.  Accordingly, the Ordinance does not violate NRS § 244.187 and is within the County's scope of authority.

### III.    Conclusion

The Ordinance complies with almost all of the relevant statutes.  The only violation (of NRS § 237.090(1)(f)) did not prejudice the public or any of the affected businesses.  The policy goals of the BIS statues were fulfilled in that the procedures utilized to create and adopt the Ordinance enabled meaningful participation by affected businesses such as Plaintiffs, and informed decision-making by the County Board.  Therefore, Dotty's' challenges to the Ordinance fail.

Based on the foregoing, the Court GRANTS the County's motion for summary judgment [Dkt. # 42], DENIES Dotty's motion for summary judgment [Dkt. #38], and DENIES Jackpot Joanie's motion for summary judgment [Dkt. # 39].  The Clerk shall enter judgment accordingly.

DATED THIS 4th day of October, 2013.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE